UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SEAN FRAZEE, et al.,

        Plaintiffs,

     v.

FCA US LLC,

        Defendant.

Case No. 1:25-cv-144

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

Sean Frazee, Felicia Cook, and David Leshock, who are the Plaintiffs and proposed class representatives in this putative class action, seek compensation for a defect in their new and used 2021–2023 Jeep Wrangler vehicles. But Defendant FCA US LLC contends, now for the second time, that the Court should compel the parties to arbitrate this dispute. For the reasons stated below, the Court **GRANTS** FCA's Renewed Motion to Compel Arbitration (Doc. 23). But rather than dismissing the case (as FCA requests), the Court opts to **STAY** the matter pending arbitration proceedings.

## BACKGROUND

Frazee, Cook, and Leshock each own a 2021–2023 Jeep Wrangler. (Compl., Doc. 1, #5–7). Each Plaintiff hails from, and purchased their particular vehicle in, a different state. (*See id.*). Specifically, Frazee purchased a new 2023 Jeep Wrangler from Mark Porter Chrysler Dodge Jeep Ram in Ohio on or about December 1, 2022. (*Id.* at #5). Cook purchased a used 2021 Jeep Wrangler from Tunkhannock Auto Mart

in Pennsylvania on or about October 1, 2023. (*Id.* at #6). And Leshock purchased a new 2021 Jeep Wrangler from Al Serra Chrysler Dodge Jeep Ram in Michigan on or about October 1, 2020. (*Id.* at #7). Plaintiffs allege that their vehicles share a common fault—a so-called "Underhood Fire Defect" that "can cause the vehicle to catch fire, starting under the hood, even if the vehicle is off and the key removed." (*Id.* at #2). Plaintiffs say the fault is common to both their Wranglers, as well as 2021–2023 Jeep Gladiators (collectively, Class Vehicles). (*Id.*). They say that "the Class Vehicles can catch fire at any time, no matter where they might be: parked on the street, in the garage of an owner's home, [or] being driven on a highway." (*Id.*). In Plaintiffs' telling, the locus of the defect is in the vehicles' "power steering pump electrical connector." (*Id.*). That theory has gained some further traction in the National Highway Transportation and Safety Administration's investigation into the matter. (*Id.*; *see id.* at #11–22). But despite FCA's knowledge of the defect, Plaintiffs allege that "FCA has done nothing to remedy the problem or even warn consumers." (*Id.* at #22).

Plaintiffs seek to represent two sets of classes—a nationwide class that the Complaint defines as "[a]ll persons or entities who purchased or leased one or more model year 2021–2023 Jeep Gladiator and Wrangler vehicles," and state subclasses that include "[a]ll persons or entities who purchased or leased one or more of the Class Vehicles in the States of Pennsylvania, Ohio, and Michigan." (*Id.* at #24). Plaintiffs allege three claims: (1) a violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. on behalf of the nationwide class or, in the alternative, the state subclasses (Count I), (*id.* at #27–30); (2) a claim for breach of implied warranty on

2

behalf of the state subclasses (Count II), (*id.* at #30–31); and (3) a claim for unjust enrichment on behalf of the state subclasses (Count III), (*id.* at #31–32).

FCA sees things differently—starting with its view on the appropriate forum for this dispute. On April 10, 2025, FCA filed a Motion to Compel Arbitration (Doc. 11). There, FCA asserted that each of the Plaintiffs' vehicles were accompanied by FCA warranty booklets that contain arbitration agreements. (*Id.* at #62–64). And those agreements, FCA said, mandate that Plaintiffs arbitrate their claims. (*Id.* at #65–68). Plaintiffs, on the other hand, said that FCA had not shown any agreement to arbitrate. (*See* Resp., Doc. 14, #290–92).

Because the parties disputed whether they had entered into a valid and enforceable arbitration agreement, the Court set a telephonic status conference to discuss that motion and an accompanying motion to dismiss. (*See* 5/27/25 Notice). There, the Court informed the parties that its first order of business would be to "determine whether there is an agreement to arbitrate." (6/3/25 Min. Order); *see, e.g.*, *Southard v. Newcomb Oil Co.*, No. 19-5187, 2019 WL 8111958, at *4 (6th Cir. Nov. 12, 2019) (quoting *Midwest Mech. Contractors, Inc. v. Commonwealth Const. Co.*, 801 F.2d 748, 750 (9th Cir. 2011)). To that end, the Court denied FCA's Motion to Compel Arbitration without prejudice and directed the parties to engage in limited discovery, "including subpoenaing the third-party dealerships and tendering narrowly tailored document requests to Plaintiffs to obtain the dealership agreements" (which were among the agreements on which FCA was relying to show the requisite commitment to arbitrate). (6/3/25 Min. Order).

The parties have since completed that limited discovery, and FCA is now back before this Court with a Renewed Motion to Compel Arbitration (Doc. 23). There, FCA contends that the documents it procured confirm that Plaintiffs agreed to arbitrate their claims. (*See generally id.*). The parties discuss those documents on a Plaintiff-by-Plaintiff basis, (*see id.* at #486–91; Pl.'s Resp. in Opp'n to Def.'s Renewed Mot. to Compel, Doc. 24, #592–95), and the Court will do the same.

## A.     The Leshock Documents.

The first set of documents to which FCA points come from Leshock and the Al Serra dealership.

In response to FCA's subpoena, the Al Serra dealership produced a document titled "FCA US LLC – Employee Advantage – Friends Program Pricing & Acknowledgment Form" (the Leshock Agreement). (Doc. 23, #486; *see* Doc. 23-2 (Leshock agreement)). The dealership used the document in connection with its sale to Leshock because he purchased his vehicle through FCA's "Employee Advantage – Friends Program." (Leshock Decl., Doc. 24-4, #615). The Leshock Agreement reflects a discount from the ordinary factory invoice price of Leshock's 2021 Jeep Wrangler. (*See* Doc. 23-2, #507). More importantly for present purposes, it also contains the following arbitration provision:

> I understand that, in consideration for this discount, I will not be able to bring a lawsuit for any warranty disputes relating to this vehicle. Instead, I agree to submit any and all disputes through the FCA US Vehicle Resolution Process, which includes mandatory arbitration that is binding on both FCA US and me. Before initiating this binding arbitration, I will attempt to resolve the dispute: (1) at the dealership, (2) through the Customer Assistance Center. I acknowledge that this Form evidences a transaction involving interstate commerce, and that

> the Federal Arbitration Act … shall govern the interpretation and enforcement of this Agreement. I represent to FCA US that before purchasing or leasing a vehicle under this Program, I received and read the Program Rules and Provisions ("Rules"), specifically including a document entitled "Vehicle Resolution Process – Binding Arbitration."

(*Id.*).

Leshock, for his part, counters that this agreement is not the "Voluntary Binding Arbitration Provision" that FCA sought to enforce in its first motion to compel arbitration. (Doc. 24, #594). This provision, he says, instead refers to FCA's separate "US Vehicle Resolution Process," which has its own "Program Rules and Provisions." (*Id.*).

One might wonder why that difference matters. After all, what stops FCA from enforcing the arbitration provision contained in the Leshock Agreement, even if that provision is separate from the Voluntary Binding Arbitration Provision contained in the warranty booklet? To plug that explanatory gap, Plaintiffs point to an "unauthenticated" copy of the program rules for the US Vehicle Resolution Process that Plaintiffs' counsel found online. (*See id.* at #603; George Decl., Doc. 24-1, #605; Doc. 24-5 (Program Rules)). Plaintiffs say that the program rules "show[] that Defendant has not (and likely cannot) meet its burden to compel arbitration of Plaintiff Leshock's claims." (Doc. 24, #603). That is at least in part because the program rules provide for arbitration by the National Center for Dispute Settlement (NCDS). (*Id.*). According to Plaintiffs, that is a problem because NCDS's "decisional authority" is "extremely narrow: 'NCDS reviews only vehicle disputes involving FCA US LLC's Limited Warranty on a FCA US LLC vehicle'" and not "'other types of disputes.'" (*Id.* (quotation omitted)). But, according to Leshock, his "claims are not

based" on any FCA limited warranty. (*Id.*). And so, he says, they "are not arbitrable." (*Id.*).

Next, FCA notes that Leshock produced evidence showing that he used an FCA warranty numerous times to have free service work performed on his vehicle, as well as a photograph of the front and back covers of Leshock's owner's manual. (Doc. 23, #487; Doc. 23-3 (service invoices); Doc. 23-4 (Leshock owner's manual covers)). To explain why that matters, FCA first points to a QR code on the back cover, which is adjacent to a sentence that reads, "download a free electronic copy of the most up-to-date owner's manual, Uconnect and warranty booklets." (Doc. 23, #487 (capitalization omitted)). According to FCA, that QR code takes users to a webpage of the warranty booklet that contains a "voluntary binding arbitration provision," (*id.*), that provides as follows:

> [T]his binding arbitration provision … applies to any dispute between you and FCA US LLC and its affiliates …. This binding arbitration provision does not affect any rights a consumer has to participate in any of FCA US LLC's nonbinding arbitration programs or any voluntary arbitration programs sponsored by any state or government agency.
>
> If your concern or dispute is not resolved within 60 days, you agree that any dispute arising out of or relating to any aspect of the relationship between you and FCA US LLC will not be decided by a judge or jury but instead by a single arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules in effect at the time you signed the Agreement to Arbitrate. This includes claims arising out of your warranty and claims arising before this agreement, such as claims related to statements about our products.
>
> …
>
> You may opt out of arbitration within 30 days after signing the agreement by sending a letter to: FCA US LLC Office of the General Counsel … [s]tating your name, Vehicle Identification Number (VIN),

6

and intent to opt out of the arbitration provision. If you do not opt out, then this agreement to arbitrate is binding.

(Doc. 23, #487–88 (quoting Doc. 11-1 (2021 Wrangler warranty booklet)) (emphasis omitted)). FCA also notes that Leshock did not produce any evidence suggesting that he had opted out of the arbitration provision within the above-described 30-day opt-out window. (*Id.* at #488)

Leshock, on the other hand, avers that he attempted to use the QR code, but that it "did not direct [him] to a working website." (Doc. 24-4, #615). Beyond that, Leshock also says that the owner's manual makes "no mention … about arbitration or the Voluntary Binding Arbitration Program." (Doc. 24, #594).

**B.     The Frazee Documents.**

Turn next to the documents relating to Frazee and his Jeep Wrangler purchase from the Porter dealership.

In response to FCA's subpoena, the Porter dealership produced a "Vehicle Service Contract" that Frazee signed with the Automobile Protection Corporation (APCO) in connection with his vehicle purchase (the Frazee Agreement). (Doc. 23, #488–89; *see* Doc. 23-5 (Frazee agreement)). Section N of the Frazee Agreement contains the following arbitration provision and class action waiver:

> 1. Arbitration is a method of resolving any claim, dispute or controversy without filing a lawsuit. In this Arbitration Provision, YOU, WE[1] and the ADMINSTRATOR (the "Parties") are waiving our right to go to court and are agreeing instead to submit any claims, disputes or controversies between the Parties to binding arbitration … The parties agree and

---

[1] The contract defines the terms "WE, US, OUR" to mean "the issuing Provider/Obligor of this CONTRACT as set forth on page 1." (Doc. 23-5, #524). And that page states that the "issuing provider," "obligor," and "administrator" is the "Automobile Protection Corporation." (*Id.* at #522).

acknowledge that YOUR purchase of this CONTRACT affects interstate commerce and the Federal Arbitration Act ("Act") applies to this Arbitration Provision.

2. The parties agree to resolve all claims, disputes and controversies (collectively "Claims") related in any way to this CONTRACT by binding arbitration, including but limited to Claims related to the sale of this CONTRACT and the relationship(s) and duties among the Parties, and including further, without limitation, Claims arising under contract, tort, statute, regulation, rule, ordinance or other rule of law or equity. In addition, the arbitrator shall decide issues related to the applicability, scope and validity of this Arbitration Provision. Notwithstanding this agreement to arbitrate, each of the Parties retains the right to seek remedies in small claims court to resolve any Claim within the jurisdiction of small claims court. By signing this CONTRACT, YOU acknowledge YOUR understanding that all Parties hereunder are waiving their rights to go to court, except for small claims court, to resolve any Claims arising under this CONTRACT between or among the parties.

3. YOU agree and hereby expressly waive any right YOU may have to litigate in small claims court, state, county or federal court any Claim on a class-action basis or in any other collective or representative proceeding as either a representative or member of a class, or as a private attorney general, or to otherwise pursue any Claim in a class-action in small claims, state, county or federal court. Notwithstanding anything to the contrary in this Arbitration Provision, any dispute regarding the validity and effect of this Class Action Waiver prohibiting YOU from participating in or filing a class-action in any court shall be determined exclusively by a court.

(Doc. 23, #489 (quoting Doc. 23-5. #527) (emphasis in original)).

Frazee contests FCA's characterization of this provision. While FCA asserts that Frazee contracted to "arbitrate all claims 'related in any way' to the purchase of the vehicle,'" (*id.*), Frazee says that he has merely agreed to arbitrate disputes between the parties that are "related in any way to *this contract*," (Doc. 24, #593 (emphasis added)). And, Frazee points out, the "contract" is an agreement between Frazee and the APCO that provides seven years of service protection on Frazee's

vehicle. (*Id.*). That matters, Frazee says, because he is not suing APCO, nor is he making a claim based on the APCO agreement. (*Id.*). Additionally, the Frazee Agreement "makes no mention of Defendant or its Voluntary Binding Arbitration Provision." (*Id.*).

FCA also seizes on a document titled "Notice to All Purchasers of Chrysler Dodge Jeep Ram Vehicles," which advises purchasers that "Ohio law requires you to use a qualified arbitration program before [su]ing the manufacturer over new car warranty disputes. Failure to arbitrate your claim may preclude you from maintaining a lawsuit under section 1345.75 of the revised code," (the Frazee Arbitration Notice). (Doc. 23, #489–90 (quoting Doc. 23-6, #535 (Frazee Arbitration Notice))). The Frazee Arbitration Notice further states that purchasers should "consult [their] Warranty and Owner Assistance Information booklet[s]" for more information regarding the arbitration program. (Doc. 23-6, #534).

Frazee again challenges FCA's characterization of the document. He says that the document does not constitute a binding agreement to arbitrate, and that the document does not mention the Voluntary Binding Arbitration Provision. (Doc. 24, #593). Rather, the document refers to Ohio's Lemon Law. (*Id.*). Frazee, however, "is not asserting lemon law clams or claims for breach of express warranty." (*Id.* at #594). And FCA "is not seeking to compel arbitration before the Better Business Bureau," (*id.*).—the arbitration program to which the Frazee Arbitration Notice refers, (*see* Doc. 23-6, #534).

9

Finally, FCA points to documents that Goldy Auto produced, which show that, on several occasions, Frazee used the FCA warranty to have free service performed on his vehicle. (Doc. 23, #490; *see* Doc. 23-7 (Frazee service documents)). And, as with Leshock, FCA notes that Frazee produced no evidence showing that he exercised his opt-out right within the 30 days specified in the warranty booklet. (Doc. 23, #490).

## C.     The Cook Documents.

Last up are the documents that FCA received on Cook. One of these is Cook's Retail Purchase Agreement with the Tunkhannock dealership, which Cook signed (the Cook RPA). (*Id.*; Doc. 23-8 (Cook RPA)). According to FCA, the Cook RPA "acknowledges that she signed an arbitration agreement." (Doc. 23, #490). But, as Cook points out, that is a rather fast and loose description of the provision that FCA cites. (*See* Doc. 24, #592). In fact, the Cook RPA says only that Cook "acknowledges that [she] signed many documents and other agreements in connection with the sale, which *may have* included ... [among other things, an] arbitration agreement." (Doc. 23-8, #549 n.18 (emphasis added)). And, Plaintiffs say, "[w]hile ... Cook 'may have' signed many of these documents with the sale, she *didn't* sign many others, including [any] arbitration agreement." (Doc. 24, #592 (emphasis in original); *see* Cook Decl., Doc. 24-2, #608 ("I did not sign any agreement to participate in the Voluntary Binding Arbitration Provision at any time.")). The Tunkhannock dealership also produced a "Retail Installment Sale Contract." (Doc. 23, #490; Doc. 23-9 (Cook installment contract)). But FCA does not describe the content of this document in its motion, and

with good reason. As Cook points out, it "contains no arbitration provision or reference to the Voluntary Binding Arbitration Provision." (Doc. 24, #592).

The Tunkhannock dealership also produced a "window sticker" page for Cook's vehicle (i.e., a window insert that was apparently used to display price and other relevant information when the 2021 Wrangler that Cook would eventually purchase was sitting on Tunkhannock's lot). (Doc. 23, #491; *see* Doc. 23-10 (Cook window sticker)). The sticker directs customers to "[a]sk Dealer for a copy of the limited warranties or see your owner's manual for details." (Doc. 23-10, #556). Again, though, no mention of the arbitration provision.

Finally, much like Leshock, Cook produced a photograph of the front cover of her owner's manual. (Doc. 23, #491; *see* Doc. 23-11 (2021 Wrangler owner's manual photograph)). Because Cook "failed to produce a copy" of the manual in response to FCA's request for production, FCA provided its own "true and accurate copy" of relevant excerpts from the manual. (Doc. 23, #491; Doc. 23-12 (2021 Wrangler owner's manual excerpts)). The first page of the manual notes that the "most up-to-date Owner's Manual, Radio Instruction Manual and Warranty Booklet can be found by visiting the website on the back cover." (Doc. 23, #491 (quoting Doc. 23-12)). And, just like Leshock, the back cover contains a QR code directing the owner to the appropriate website. (*Id.*). Further, the owner's manual's table of contents directs the reader to page 362 of the manual for "warranty information," and page 362 in turn refers the reader to the appropriate website. (*Id.*). Cook, unsurprisingly, notes that

11

the nearly four-hundred-page owner's manual contains no mention of the Voluntary Binding Arbitration Provision. (Doc. 24, #592–93).

Based on all this evidence, FCA maintains that the Court should compel arbitration. (*See generally* Doc. 23). Plaintiffs have responded, (Doc. 24), and FCA has replied, (Doc. 25). So the matter is ripe for review.

## LEGAL STANDARD

The Federal Arbitration Act (FAA) provides that "[a] written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Because "arbitration is a matter of contract," courts must "'rigorously enforce' arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quotation omitted); *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 878 (6th Cir. 2021).

Parties to an arbitration agreement may "delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by clear and unmistakable evidence." *In re StockX*, 19 F.4th at 878 (quotation marks omitted) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019)). "A challenge to arbitration agreement *formation*," however, "is always in the jurisdiction of the courts." *Becker v. Delek U.S. Energy, Inc.*, 39 F.4th 351, 355 (6th Cir. 2022) (emphasis added) (citing *Granite Rock Co. v. Int'l Bd. of Teamsters*, 561 U.S. 287,

12

299–300 (2010)); *see Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) (quotation omitted) ("[A]rbitration 'is a matter of consent, not coercion.'").

Section 4 of the FAA provides that if the "making of the agreement for arbitration … is not in issue," the Court must direct "the parties to proceed to arbitration." 9 U.S.C. § 4. But if formation is "in issue," then "the court shall proceed summarily to the trial thereof." *Id.* To determine whether the parties have put contract formation "in issue," the Court "applies the standard for summary judgment." *In re StockX*, 19 F.4th at 881 (first citing *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002); and then citing *Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1001 (6th Cir. 2009)); *see* Fed. R. Civ. P. 56(a). Under that standard, FCA, "as the movant asserting the existence of a contract, must initially carry its burden to produce evidence that would allow a reasonable jury to find that a contract [for arbitration] exists." *In re StockX*, 19 F.4th at 881 (citations omitted). The burden then shifts to the non-moving party—here, Plaintiffs—"to cite particular materials in the record to show that there is a genuine dispute of material fact that could lead a rational trier of fact to find that a contract does not exist." *Id.* at 882 (cleaned up) (citations omitted). If, based on the competing evidence the parties put forward, "'a reasonable finder of fact could conclude that no valid agreement to arbitrate exists,' the issue is subject to resolution by a jury." *Mazera*, 565 F.3d at 1001 (quoting *Great Earth*, 288 F.3d at 889).

**LAW AND ANALYSIS**

In support of its Motion to Compel Arbitration, FCA contends that it has put forth sufficient evidence that each named Plaintiff has agreed to arbitrate their claims. (Doc. 23, #496–500). It also contends that Plaintiffs have delegated the question whether their claims are arbitrable to an arbitrator. (*Id.* at #493–96). Plaintiffs, on the other hand, assert that FCA has failed to produce evidence that could lead a rational trier of fact to conclude that a contract exists. (*See* Doc. 24, #595–97, 599–603). Alternatively, Plaintiffs contend that, even if FCA has produced sufficient evidence to support the conclusion that Plaintiffs agreed to FCA's Voluntary Binding Arbitration Provision, any such agreement is unconscionable. (*See id.* at #597–98). Finally, Plaintiffs say that, to the extent the Court compels arbitration on any of Plaintiffs' claims, it should exercise its discretion to permit the remaining claims to proceed. (*See id.* at #603–04).

**A.     Formation.**

The Court starts with formation. But before it can get there, it must answer an antecedent question—choice of law. "Because arbitration agreements are fundamentally contracts, [the Court] review[s] the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007). Here, the law of three different states is arguably in play—Ohio (where this Court sits and where Frazee purchased his vehicle), Michigan (where Leshock purchased his vehicle), and Pennsylvania (where Cook purchased her vehicle).

14

Ordinarily, the Court would conduct a choice-of-law analysis to determine which body of contract law applies to which alleged agreement. Here, however, the Court opts to apply Ohio contract law. That's because Plaintiffs argue primarily Ohio law in their briefing, (*see generally* Doc. 24), a decision that the FCA does not contest, (*see generally* Doc. 23; Doc. 25). Thus, "[t]he parties' litigation choices allow [the Court] to avoid this choice-of-law issue." *AtriCure, Inc. v. Meng*, 12 F.4th 516, 525 (6th Cir. 2021); *see also Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019) (citations omitted) ("[Courts] regularly rely on the litigants' agreement about the governing law (or, more often, on one litigant's failure to dispute the issue) to avoid deciding what could be knotty choice-of-law questions.").[2]

So with that preliminary matter out of the way, the Court turns to the formation issue itself. In doing so, though, the Court pauses to explain the difference between two related, but separate, concepts—formation and enforceability. Questions of formation go to whether the parties formed a contract at all. Questions of enforceability, by contrast, ask whether a court should enforce an already-formed contract (or a given provision in such a contract). "[C]ontract formation under Ohio law requires an offer, acceptance, consideration, a manifestation of mutual assent, and a meeting of the minds as to the essential terms of the contract." *McFadden v. Charter Commc'ns, Inc.*, 2024-Ohio-4564, ¶ 14 (9th Dist.). Enforceability doctrines, by contrast, involve things like unconscionability. A party raising an

---

[2] Plaintiffs note, in connection with a separate issue, that "the claims of each Plaintiff are based on the laws of different states." (Doc. 24, #604). Should the parties wish to explore the choice-of-law issues in this case in the future, the Court encourages the parties to devote a portion of their briefing to the issue.

unconscionability argument is not saying that no contract was formed (in the sense that acceptance, for example, was missing). Rather, they contend that the already formed contract should not be enforced (or perhaps should be voided) in whole or in part.

The distinction matters when dealing with arbitration issues. That is because, as noted above, questions of formation are for the court. Questions of enforceability, by contrast, are arbitrability questions and thus may (or may not be, depending on the terms of the arbitration agreement) questions for the arbitrator. So the "who decides" question turns, at least in the first instance, on whether the Plaintiffs here are actually challenging formation or instead challenging enforceability.

Plaintiffs claim that they are challenging the former—formation. But the Court disagrees. That is because Plaintiffs' formation arguments seem to rest on an underlying assumption that, generally speaking, arbitration provisions bind only if they are entered into separate and apart from any other underlying contract. In other words, they believe the inquiry is whether a given plaintiff specifically formed an arbitration agreement, not merely whether the plaintiff formed a contract that *included* a requirement to arbitrate. (Larger contracts that include an arbitration provision are sometimes referred to as "container contracts," *see, e.g.*, *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020), and that is the terminology the Court uses here.)

Plaintiffs' reliance on *Frisch v. FCA US LLC*, No. 2:24-cv-10546, 2025 WL 1592935 (E.D. Mich. June 5, 2025), demonstrates the point. (*See* Doc. 24, #596–97).

16

The *Frisch* court admittedly denied a motion to compel arbitration based on one of the arbitration provisions that FCA relies on here. 2025 WL 1592935, at *1. In reaching that result, though, the case cites *Hergenreder v. Bickford Senior Living Group, LLC*, 656 F.3d 411 (6th Cir. 2011), and *Tillman v. Macy's, Inc.*, 735 F.3d 453 (6th Cir. 2013). *Frisch*, 2025 WL 1492935, at *4–5.

In *Hergenreder*, an employer sought to compel arbitration based on an arbitration provision in the employer's "Dispute Resolution Procedure" (DRP). 656 F.3d at 414. Although the plaintiff did not sign the DRP, she did sign various other documents at the outset of her employment. *Id.* at 413–14. One such document was a form indicating "she had read and understood the terms of Bickford's Employee Handbook." *Id.* at 414. And the employee handbook, in turn, referred readers to the DRP "for details," but did not explain that the DRP "contained arbitration terms and constituted an arbitration agreement." *Id.* at 417. On these facts, the Sixth Circuit held that there was "neither an offer nor an acceptance." *Id.* at 418. There was no offer because a mere "reference" to the DRP in the handbook was insufficient to show an objective "manifestation of willingness to enter into a bargain." *Id.* (citation omitted). And there was therefore no acceptance because there was "no evidence" that the plaintiff knew that the DRP contained an arbitration agreement or arbitration information. *Id.* at 419.

*Tillman*, which also involved an opt-out scheme, went the other way. There, though, the defendant-employer (1) mailed the plaintiff-employee documents that "described in detail the dispute-resolution process and noted that while employees

17

were automatically 'covered' by arbitration by virtue of continuing employment with Macy's, they could opt out of binding arbitration," as well as an election form that described the opt-out procedure; (2) required the plaintiff to attend a "mandatory video screening" that provided "detailed information about the opt-out process"; (3) sent the plaintiff a brochure indicating that, because she had not "returned her opt-out form," she was now bound by the program, "specifically including … [a]rbitration"; and (4) sent another election form and brochure when Macy's updated its program, specifically noting that the plaintiff would need to return the opt-out form or else "be bound to arbitrate future disputes."  735 F.3d at 455–56. On these facts, the Sixth Circuit held that "Macy's effectively communicated to Tillman an offer to enter into a binding arbitration agreement and to waive her right to a jury trial." *Id.* at 456. Unlike in *Hergenreder*, Macy's provided more than a "vague reference in an employee handbook that did not explicitly mention arbitration." *Id.* at 459 (citing *Hergenreder*, 656 F.3d at 414–16). And because the *Tillman* plaintiff thus had more than "general knowledge that a dispute-resolution procedure existed," the offer to arbitrate was effective. *Id.* In light of those facts, the plaintiff's conduct— failing to return the opt-out form while continuing her employment at Macy's— "mirror[ed] that called for in the offer," making the plaintiff's acceptance effective. *Id.* at 460.

In short, both cases involved pure questions of formation—had the parties formed a contract that required arbitration? And in both *Hergenreder* and *Tillman*, the courts correctly concluded that this was a question the courts must answer. But

18

in the Court's view, neither case is on point given the facts here. That's because both cases appear to involve situations where the question was whether the parties had formed a standalone arbitration agreement. True, the plaintiff in *Hergenreder* "signed numerous documents, including her employment application, tax and insurance forms, a background-check-consent form, a form agreeing to notify Bickford of any subsequent criminal convictions, … a form acknowledging that she received notice of Bickford's worker's compensation procedure," and "an acknowledgment that she had read and understood the terms of Bickford's Employee Handbook." 656 F.3d at 413–14. But neither party identified some broader contract of which the arbitration agreement formed a part. Rather, the question in that case was solely whether the parties had formed a standalone agreement to arbitrate. Likewise, in *Tillman*, there was no indication that the arbitration agreement was included in some larger container agreement. Here, by contrast, the arbitration agreement is but one term in a broader contractual agreement that Plaintiffs entered into when they purchased their vehicles.

That difference matters. Courts are clear that, when a party forms a container agreement, i.e., enters a contract that includes an arbitration provision, then a party seeking to challenge formation must direct their challenge at the container contract itself. *See, e.g., Iezzi v. CrossCountry Mortg., LLC*, No. 23-2827, 2024 WL 37951, at *5 (E.D. Pa. Jan. 3, 2024) ("A claim that the container contract lacked mutual assent necessarily puts the existence of the arbitration agreement at issue and thus goes straight to court." (internal quotation marks omitted)). In other words, if the

19

Plaintiffs here intend to challenge formation, and the arbitration provision they are contesting is a term included in a container agreement, then they must show that they did not enter that container agreement. They cannot simply contend that, container agreement notwithstanding, they did not separately form the arbitration agreement included within it. Rather, if they are admitting that they formed the container agreement (that included the arbitration provision), but contend that the arbitration provision nonetheless should not be enforceable (e.g., because FCA failed to adequately disclose it or some such argument), then that is an *enforceability* argument, not a *formation* argument. And, as described below (*see* infra Law & Analysis, Part B), under the arbitration agreements here, questions of enforceability go to the arbitrator.

With that point of clarification in mind, the Court turns to the evidence FCA presents.

**1. Leshock Has Agreed to Arbitrate His Claims Under the Voluntary Binding Arbitration Provision Contained in the Warranty Booklet and the Arbitration Provision in the Leshock Agreement.**

Recall that FCA proffers four pieces of evidence to support the proposition that Leshock has agreed to arbitrate his claims: (1) the Voluntary Binding Arbitration Provision contained in the digital warranty booklet; (2) the arbitration provision contained in the Leshock Agreement; (3) photographs of Leshock's owner's manual, which FCA uses to contend that Leshock had adequate access to the Voluntary Binding Arbitration Provision; and (4) service invoices, which, according to FCA, demonstrate that Leshock took advantage of FCA's warranties for free services. The

Court ultimately concludes that FCA has put forth evidence that would allow a reasonable trier of fact to conclude that the parties formed an agreement that included an arbitration provision, both as to the warranty (which contained a Voluntary Binding Arbitration Provision) and the Leshock Agreement.

Start with FCA's warranty booklet. FCA argues that Leshock "agreed to arbitrate through the FCA Warranty Booklet when he received notice through the Owner's Manual (and failed to opt out within 30 days)." (Doc. 23, #497). Leshock responds that FCA's "unilateral and undisclosed" arbitration provision is insufficient to show an agreement to arbitrate. (Doc. 24, #596). Leshock's argument echoes *Frisch*, which asserted that "[w]hile FCA's … argument[] might demonstrate that FCA put [Leshock] on notice of *the written warranties*, none of this evidence demonstrates FCA notified [Leshock] of the agreement to arbitrate contained therein." *Frisch*, 2025 WL 1592935, at *7. And absent notice of FCA's offer, Leshock says, nothing follows from Leshock's inaction. (Doc. 24, #596–97).

The Court is not persuaded. While Leshock may not have been aware of the arbitration provision in the warranty booklet, he was certainly on notice that the broader contract into which he was entering included warranties. And one of the provisions in the booklet that contained the warranties was an arbitration provision. That alone is sufficient to show that the agreement included the arbitration provision; FCA need not demonstrate Leshock somehow specifically agreed to the arbitration provision separate and apart from the underlying container agreement.

21

Indeed, Leshock's post-purchase conduct lends support to the notion that he entered the broader warranty contract (of which the arbitration provision was merely one component). FCA points to several invoices, which, it says, demonstrate that Leshock took advantage of the warranties contained in the warranty booklet. (*See* Doc. 23, #497; Doc. 23-3).

The Court agrees. The invoices reflect that Leshock took his 2021 Wrangler in for service several times between August 2021 and December 2024. (*See* Doc. 23-3, #509–17). And, in each case, the invoices reflect that Leshock relied on a warranty to avoid the cost of repairs.[3] (*See id.*). Moreover, even if he lacked actual knowledge of the arbitration provision and its contents, he was on constructive notice of the warranty's terms. *See, e.g., W.K. v. Farrell*, 853 N.E.2d 728, 733 (Ohio Ct. App. 2006) ("[I]t is well established that one party's failure to read relevant documents before signing them does not negate the intent to be bound by those documents."). In short, Leshock formed a warranty contract with FCA, and that contract included an arbitration provision. True, Leshock may wish to challenge the *enforceability* of that provision on the facts here, but the point is simply that any such challenge does not fall within the courts-must-decide-formation-questions rubric.

FCA has therefore carried its initial burden of putting forth facts that would permit a reasonable trier of fact to find that Leshock formed a contract that included an arbitration provision (the Voluntary Binding Arbitration Provision). And nothing that Leshock has submitted creates a genuine dispute of material fact as to whether

---

[3] Nowhere in Plaintiffs' briefing does Leshock contest that he availed himself of FCA's warranties for the repairs.

he formed this agreement. So the Court concludes that a jury trial is not warranted on the question whether Leshock is a party to a contract that includes the Voluntary Binding Arbitration Provision.

But that's not all. In addition to the warranty agreement (and its Voluntary Binding Arbitration Provision), FCA also points to the Leshock Agreement, which also contains an arbitration provision. (*See* Doc. 23, #486–87, 497–98; Doc. 23-2; Doc. 25, #631–32). And that agreement, which Leshock signed, expressly bars Leshock from bringing "a lawsuit for *any warranty disputes relating to this vehicle.*" (Doc. 23-2, #507 (emphasis added)). Rather, Leshock must submit "any and all" such disputes "through the FCA US Vehicle Resolution Process, which includes mandatory arbitration that is binding on both FCA US and me." (*Id.*). Because this is a warranty dispute, FCA has for a second time carried its initial burden of proving up facts that would allow a reasonable trier of fact to conclude that an arbitration agreement exists between Leshock and FCA.

Leshock attempts to create a genuine dispute of material fact as to the Leshock Agreement by arguing that the FCA US Vehicle Resolution Process does not handle claims like those that Plaintiffs assert here. (*See* Doc. 24, #602–03). In support, Leshock quotes the "Official Program Rules for the Employee Advantage – Friends Program." (*Id.* at #603; *see* Doc. 24-1, #605 (providing a link to the rules); Doc. 24-5). The program rules, which, as noted, provide for arbitration under the auspices of the NCDS, are "extremely narrow: 'NCDS reviews only vehicle disputes involving FCA US LLC's Limited Warranty on a FCA US LLC vehicle' and makes clear that the

23

'Vehicle Resolution Process does not review other types of disputes.'" (Doc. 24, #603). But Leshock says that his warranty claims "are not based on FCA US LLC's Limited Warranty," and that they are therefore "not arbitrable." (*Id.*).

But that argument again focuses on the wrong question. Leshock formed a contract (the Leshock Agreement) that includes an arbitration provision. So, if he contends that the dispute here is one that falls outside the scope of that provision, that is a question of arbitrability, not formation. But understood that way, the relevant question would be who—the Court or the arbitrator—decides arbitrability under this provision. The Court returns to that issue below (*see* infra Law & Analysis, Part B), but for now simply notes that this is not a dispute about *formation*, and thus not a question assigned to the Court on courts-must-decide-formation grounds.

In sum, the Court concludes that FCA has put forth sufficient factual matter to allow a jury to conclude that the parties formed agreements that included arbitration provisions. And because Leshock has not created a genuine issue of material fact as to whether he formed either agreement, the Court concludes that a jury resolution of the issue is unwarranted.

### 2. Frazee Has Agreed to Arbitrate His Claims Under the Voluntary Binding Arbitration Provision.

Next up is Frazee. In support of its argument for formation, FCA points to (1) the arbitration provision in the Frazee Agreement, (2) the Frazee Arbitration Notice, and (3) invoices demonstrating that Frazee relied on FCA's warranties for free repairs. (Doc. 23, #488–90).

24

The Court proceeds immediately to the third item, which it finds dispositive here. It is clear that Frazee was on notice that the vehicle he purchased was covered by a warranty when he purchased it. And, as above, the mere fact that Frazee did not specifically agree to the arbitration provision is beside the point because the arbitration provision in the warranty booklet is but one part of a larger container contract (the warranty). Additionally, just as with Leshock, FCA has provided evidence that Frazee has on several occasions relied on FCA's warranties for the purpose of obtaining free service work, confirming that he is in fact a party to that contract. (*See* Doc. 23-7, #536–46). And because the Plaintiffs' briefing does not contest that Frazee relied on the warranty for the repairs, the Court concludes that Frazee has failed to create a genuine dispute of material fact as to whether the parties formed an agreement to arbitrate that at least arguably covers Frazee's claims.

### 3. Cook Has Also Agreed to Arbitrate Her Claims.

Finally, the Court comes to Cook. While FCA points to no evidence demonstrating that Cook has relied on FCA's warranties for free repairs, FCA has produced window stickers for Cook's vehicle that expressly mention warranty coverage. (Doc. 23-10, #556). The sticker directs purchasers to the "owner's manual" or to ask the dealer for a "copy of the limited warranties" for more information. (*Id.*). As noted, this sticker would have been on Cook's vehicle when she purchased it. Thus, Cook cannot claim that she was unaware that her vehicle came with warranties. True, the purchaser may be entirely unaware that the warranty contains an

arbitration provision, but, at the risk of undue repetition, that goes to enforceability, not formation.

Cook's attempts to resist this conclusion fall short because they ignore this distinction. In challenging formation, she relies solely on the claim that the cited materials contain "[n]o mention of arbitration or the Voluntary Binding Arbitration Provision." (Doc. 24, #592). That may be so, and it may well provide a reason for not *enforcing* the arbitration provision. But that provision is one element in a larger contractual agreement, and there is no legitimate question here as to whether she *formed* that container agreement.

In sum, all three Plaintiffs formed contracts that include arbitration provisions.

**B.     Arbitrability.**

The upshot is that FCA has successfully demonstrated the existence of four agreements: (1) a warranty (that includes a Voluntary Binding Arbitration Provision) with Leshock, (2) a separate agreement with Leshock (the Leshock Agreement) that includes an arbitration provision, (3) a warranty with Frazee, and (4) a warranty with Cook.

The Court now proceeds to answer another question: who decides whether these agreements (1) are enforceable, and (2) have a scope that covers the instant dispute? As this Court has previously explained, "parties can agree to 'have an arbitrator decide not only the merits of a particular dispute, but also gateway questions of arbitrability, such as … whether their agreement covers a particular

26

controversy," i.e., questions of scope. *Great Am. Ins. Co. v. Johnson Controls, Inc.*, No. 1:20-cv-96, 2020 WL 4569126, at *7 (S.D. Ohio Aug. 7, 2020) (quoting *Henry Schein*, 589 U.S. at 68–69). Likewise, parties can delegate decisional authority on defenses such as unconscionability, which go to whether the agreement is enforceable, rather than whether the agreement was formed. *See, e.g.*, *Wealth Assistants LLC v. Thread Bank*, No. H-24-40, 2024 WL 2980812, at *9 (S.D. Tex. June 13, 2024) ("Plaintiff's procedural and substantive unconscionability arguments must be decided by the arbitrator and not the court."). The underlying notion is that the arbitration provision also includes "an additional, antecedent agreement about who, a court or an arbitrator, should answer these [gateway] questions." *Great Am. Ins. Co.*, 2020 WL 4569126, at *7 (quoting *Rent-A-Center West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). "And when parties have agreed to arbitrate 'arbitrability,' a court may not disregard their agreement." *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 844 (6th Cir. 2020). That is true even when the agreement to arbitrate arbitrability is imputed from constructive notice of the arbitration provision.

That said, actually *showing* that parties have agreed to delegate threshold questions of arbitrability is no small task. The Supreme Court made clear in *First Options of Chicago, Inc. v. Kaplan*, that the default rule is that courts decide arbitrability. 514 U.S. 938, 944 (1995). To defeat that presumption, the party seeking arbitration must put on "clear and unmistakable evidence" to the contrary. *Id.* (cleaned up).

As to the first, third, and fourth agreements—i.e., those formed through the warranty—the answer to whether FCA has done so is clear. In *Blanton*, the Sixth Circuit joined "eleven out of twelve" sister circuits in holding that "the incorporation of the [American Arbitration Association's Consumer Arbitration Rules] provides 'clear and unmistakable' evidence that the parties agreed to arbitrate 'arbitrability.'" 962 F.3d at 846 (citations omitted). And here, the Voluntary Binding Arbitration Provisions in the warranty agreements expressly incorporate those rules. (*See* Doc. 11-1 ("[Y]ou agree that any dispute arising out of or relating to any aspect of the relationship between you and FCA US LLC will not be decided by a judge or jury but instead by a single arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules." (emphasis omitted)). So the first, third, and fourth agreements delegate arbitrability to the arbitrator.

The Court reaches a slightly different conclusion with respect to the Leshock Agreement. Unlike the Voluntary Binding Arbitration Provision, the Leshock Agreement does not incorporate the AAA Consumer Arbitration Rules. And while the Leshock Agreement contains broad language requiring arbitration "for any warranty disputes relating to this vehicle," (Doc. 23-2, #507), out-of-circuit authority suggests that "broad arbitration clauses that generally commit all interpretive disputes 'relating to' or 'arising out of' the agreement do not satisfy the clear and unmistakable test," *Carson v. Giant Food, Inc.*, 175 F.3d 325, 330 (4th Cir. 1999).

Nonetheless, the Court concludes that the provision applies to the Leshock Agreement. Because arbitration provisions are contracts, federal courts interpret

28

them in accordance with state law principles. *Seawright*, 507 F.3d at 972. In Ohio, contracts "must be given a just and reasonable construction that carries out the intent of the parties as evidenced by the contractual language." *Ohio Water Dev. Auth. v. W. Rsrv. Water Dist.*, 776 N.E.2d 530, 535 (Ohio Ct. App. 2002) (citing *Skivolocki v. E. Ohio Gas Go.*, 313 N.E.2d 374 (Ohio 1974). "The parties' intent is presumed to reside solely within the language employed in the agreement." *Id.* (citing *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411 (Ohio 1987)). And here, the Leshock Agreement's plain language is broad enough to sweep in Leshock's warranty claims. (*See* Doc. 23-2, #407 ("I agree to submit *any and all* [warranty] disputes through the FCA US Vehicle Resolution Process." (emphasis added))). So, although the Leshock Agreement does not delegate arbitrability to an arbitrator, the Court, considering the question for itself, concludes that the Agreement covers Leshock's warranty claims in this dispute.

## C.     Remedy.

That leaves one final piece of housekeeping: the appropriate remedy. FCA's Motion to Compel Arbitration requests dismissal. (Doc. 23, #500). Plaintiffs, on the other hand, say that the Court should not dismiss, but should rather stay the case, if it holds for FCA. (Doc. 24, #603–04).

Here, the Court agrees with Plaintiffs. "There is a circuit split over how much discretion a district court has when considering whether to stay or dismiss an action once the parties have been compelled to arbitrate." *Wells Fargo Clearing Servs., LLC v. Satter*, No. 1:22-cv-539, 2025 WL 1582253, at *4 (S.D. Ohio June 4, 2025) (citing *Anderson v. Charter Commc'ns, Inc.*, 860 F. App'x 374, 379–80 (6th Cir. 2021)). While

29

the "Federal Arbitration Act indicates that the court 'shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement,'" "the Sixth Circuit has allowed district courts to choose to dismiss the action if 'it is clear that the entire controversy between the parties will be resolved by arbitration.'" *Id.* (citations omitted). Here, "the parties left several 'gateway' issues for the arbitrator," and as a result, "the arbitration may not resolve all claims." *Anderson*, 860 F. App'x at 380. Additionally, "a dismissal, unlike a stay, permits an objecting party to file an immediate appeal," which "undercuts the pro-arbitration appellate-review provisions of the Act." *Arabian Motors Grp. W.LL. v. Ford Motor Co.*, 19 F.4th 938, 942 (6th Cir. 2021). For these reasons, the Court concludes that a stay pending arbitration is the best course.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** FCA's Renewed Motion to Compel Arbitration (Doc. 23). To be clear, the arbitrator assigned to any of the three disputes may well conclude that the arbitration provision at issue is not enforceable or does not cover the sort of claims at issue here. But under the terms of the arbitration agreements here, that is a matter for the assigned arbitrator to decide. Consistent with that, the Court **STAYS** this matter pending resolution of the arbitration proceedings.

**SO ORDERED.**

March 16, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

30